Flushingside Realty & Construction Company v. Commissioner.
Flushingside Realty & Constr. Co. v. Commissioner
Docket No. 107311.
United States Tax Court
1943 Tax Ct. Memo LEXIS 257; 2 T.C.M. (CCH) 259; T.C.M. (RIA) 43286; June 10, 1943
*257 Prior to the taxable years here involved portions of certain properties owned by petitioner were condemned and taken for street widening. The compensation for the taking was paid to petitioner in the taxable years 1932, 1935 and 1936. Held, under section 112 (f) of the Revenue Acts of 1932, 1934 and 1936, petitioner did not expend any of the award money in the establishment of a replacement fund but did expend part of the award money forthwith in good faith in the acquisition of other property similar or related in service or use to the property taken. Winter Realty & Construction Co., 2 T.C. 38 followed. 2. During the taxable year 1936, petitioner received in addition to the above award a certain amount designated as interest. Held, the amount so designated was not a part of the award but was compensation for delay in payments. Kieselbach, et al. v. Commissioner. 317 U.S. 399. Held, further, petitioner erred in accruing part of this interest and reporting it on its income tax returns in prior years and the amount so designated as interest all accrued in 1936 when the final court decree was entered and *258 the amount designated as interest was awarded to petitioner and paid. Patrick McGuirl, Inc. v. Commissioner, 74 Fed. (2d) 729, followed. 3. Upon the record, amounts determined which petitioner is entitled to deduct for each of the taxable years 1936, 1937 and 1938 as reasonable allowances for salaries or other compensation paid to officers for services actually rendered to petitioner in those years. William Cogger, Esq., 315 Evening Star Bldg., Washington, D.C., and Philip F. Biggins, Esq., for the petitioner. Thomas H. Lewis, Jr., Esq., for the respondent. BLACK Memorandum Findings of Fact and Opinion This proceeding involves the determination by the respondent of deficiencies in income and excess-profits taxes against petitioner in amounts and for taxable years as follows: Excess-Profits
Year
Income Tax
Tax
1932
$ 436.97
1935
44.25
1936
27,859.32
$11,341.86
1937
576.36
1938
230.63
Petitioner has assigned nine errors as follows: (a) The Respondent erred for the year 1932 in adding to Petitioner's income an alleged capital gain in the sum of $3,052.97. (b) For the year 1935 the Respondent erred in adding an alleged capital *259 gain to the income of the Petitioner for that year amounting to $15,462.87. (c) For the year 1936 the Respondent erred in adding to the net income of the Petitioner an alleged capital gain of $90,657.84. (d) For the year 1932 the Respondent erred in adding to Petitioner's income alleged taxes amounting to $9,427.64. (e) For the year 1932 the Respondent erred in failing to allow Petitioner taxes which accrued for the year 1932 amounting to $2,527.95. (f) For the year 1936 the Respondent erred in adding to Petitioner's income as alleged interest an additional amount of $19,220.37. (g) For the year 1936 the Respondent erred in disallowing officers' salaries of Petitioner corporation amounting to $7,200. (h) For the year 1937 the Respondent erred in disallowing as a deduction from income officers' salaries of Petitioner corporation amounting to $7,200. (i) For the year 1938 the Respondent erred in disallowing as a deduction from income of Petitioner corporation officers' salaries amounting to $7,200. In addition to the above adjustments to net income made by the respondent and which adjustments petitioner has assigned as error, the respondent also made adjustments to net income *260 for all the taxable years on account of depreciation and for the year 1935 on account of interest, which adjustments for depreciation and interest have been accepted by petitioner. Findings of Fact Petitioner is a corporation with its principal office in Flushing, New York. Its returns for the periods here involved were filed with the Collector of Internal Revenue at Brooklyn, New York. The returns were made on the accrual basis. Issues (a), (b) and (c). The respondent in adjusting petitioner's net income for the years 1932, 1935 and 1936 added thereto as capital gain the amounts of $3,052.97, $15,462.87 and $90,657.84, respectively. In a statement attached to the deficiency notice he explained the adjustment for 1932 as follows: "(a) It is held that the profit realized from the condemnation of property by the City of New York constitutes taxable income since the proceeds of the awards were not forthwith expended in the acquisition of other property similar or related in service or use to the property condemned; nor in the acquisition of control of a corporation owning such property; nor in the establishment of a replacement fund, in accordance with the provisions of section *261 112 (f) of the applicable Revenue Act. [Here follows a computation resulting in a determination of profit from the condemnation of property for the year 1932 of $3,052.97.]" The respondent's explanation of the adjustments for 1935 and 1936 was the same as for 1932, except for the computation of the respective capital gains of $15,462.87 and $90,657.84. On May 23, 1930, the City of New York commenced proceeding for the condemnation and taking of property necessary to widen a public street known as Northern Boulevard, sometimes also called Broadway, in Flushing, Borough of Queens, New York, New York. Title to the property taken passed to the City of New York on November 4, 1931. A part of the property taken was at the time of the taking owned by petitioner and consisted of two parcels designated on the damage map in the condemnation proceeding as Damage Parcels Nos. 11, 19 and 20. Parcels Nos. 19 and 20 were considered as one parcel of land. Petitioner was paid for this taking by the City of New York on dates and in amounts as follows: Designated
Designated
Date
Parcel No.
As Award
As Interest
Total
May 12, 1932
11
$ 12,216.00
$ 12,216.00
May 12, 1932
19 & 20
45,191.40
45,191.40
July 15, 1932
19 & 20
33,538.80
33,538.80
Nov. 12, 1935
11
19,144.00
$ 5,015.67
24,159.67
May 4, 1936
19 & 20
103,269.80
32,258.72
135,528.52
$213,360.00
$37,274.39
$250,634.39
*262 In collecting these awards petitioner expended for legal fees $5,879.60 in 1932, $1,449.58 in 1935, and $9,486.99 in 1936, or a total of $16,816.17. The City of New York made an assessment against the remaining property in 1932 of $124.35, in 1935 of $2,231.55, and in 1936 of $3,124.97, or a total of assessments deducted from the awards of $5,480.87. The amount of capital gain realized by petitioner (exclusive of interest) due to the taking of the above mentioned property was as follows: 1932
$ 3,052.97
1935
15,462.87
1936
90,657.84
$109,173.68
The amount of the award with respect to Parcel No. 11 was in litigation until settled on or about November 12, 1935. The amount of the award with respect to Parcels Nos. 19 and 20 was in litigation until settled on or about May 4, 1936. The above total awards were for land and improvements respectively, as follows: Improve-
Parcel No.
Land
ments
Total
11
$ 23,860
$ 7,500
$ 31,360
19 & 20
160,000
22,000
182,000
$183,860
$29,500
$213,360
The nature of the above properties which were compulsorily or involuntarily converted into money was as follows: Parcel No. 11 was known as 58 Broadway, Flushing, *263 New York, and is situated on the northwest corner of Northern Boulevard and Prince Street, having a frontage of 26.04 feet on Northern Boulevard and a depth of 101.68 feet on the westerly side of Prince Street; 26 feet on its northerly boundary and 101.18 feet on its westerly boundary. This property was improved with a three-story frame and stucco store and dwelling building; also a one-story frame and stucco store, also a two-story stucco store and dwelling. All the stores and the rooms above were rented to tenants whose occupancy had been continuous for a number of years. Parcels Nos. 19 and 20 were situated on the southwest corner of Northern Boulevard and Lawrence Street, and consisted of a tract of land 105.34 feet fronting on the southerly side of Northern Boulevard and a depth of 162.90 feet on the westerly side of Lawrence Street; and on the southerly end the lot extended westerly 99.22 feet from the westerly side of Lawrence Street; the westerly boundary of the lot is broken with a depth of approximately 160 feet, more or less. These parcels were improved with a non-story frame shed; one-story frame store; three-story frame building consisting of stores and rooms above, *264 a one-story frame store, a two-story frame building used for store and dwellings; a one-story concrete block building used as a store and a two-story frame building used as a dwelling and a frame shed. These improvements were rented to tenants whose occupancy had been continuous for a number of years. At some time between May 12, and December 31, 1932, petitioner made an application for permission to establish a replacement fund. The application was not accompanied by a completed bond. The respondent has no record of such application having been made. In closing its books for the year 1932, petitioner set up on the liability side of its ledger an account called "Replacement Fund" in the amount of $85,130.60, which amount, except for a discrepancy of $64, represented the total of the three above mentioned partial awards received in 1932 less the above mentioned collection fees paid in 1932. On March 15, 1933, petitioner's vicepresident, William J. Halleran, addressed a letter to the Collector at Brooklyn, the body of which is as follows: We enclose herewith corporation returns for the FLUSHINGSIDE REALTY & CONSTRUCTION COMPANY, TWINBORO CORPORATION and the WINTER REALTY & CONSTRUCTION *265 COMPANY. You will note, in each instance, there has been set up a figure headed "replacement fund." This figure represents sixty (60) per cent of the City's appraisal, of an award due each corporation for property taken by condemnation, along Northern Boulevard, Flushing, New York. The balance of this award has not, as yet, been paid. It is the intention of each corporation, upon receipt of the balance of the award, to replace same in property in similar or related in service, or use of the property so converted; or, in the acquisition of control of corporation owning such other property. Upon receipt of the balance of the award on Parcel 11 on November 12, 1935, petitioner increased the amount of the account captioned "Replacement Fund" on the liability side of its ledger from $85,130.60 to $102,825.02. This increase of $17,694.42 represented the difference between the above mentioned amount of $19,144 received on November 12, 1935, and the above mentioned collection fees paid in 1935 of $1,449.58. Upon receipt of the balance of the award on Parcels 19 and 20 on May 4, 1936, petitioner increased the amount of the account captioned "Replacement Fund" on the liability side of its *266 ledger from $102,825.02 to $196,607.83. This increase of $93,782.81 represented the difference between the above mentioned award money received in 1936 and the above mentioned collection fees paid in 1936. On February 3, 1937, petitioner filed with the Commissioner of Internal Revenue an "Application To Establish A Replacement Fund" on Form 1114, revised February 1927. This application had two schedules attached thereto which were designated as "Schedule A - Statement of Facts" and "Schedule B - Surety Bond." In Schedule A petitioner stated "1937" as the "Date replacement will be completed." The bond was for $59,000, but was not signed, pending approval by the Commissioner. The printed instructions on this Form 1114 were in part as follows: 1. The applicant should execute the form of application in triplicate and fill in Schedule A. * * *
2. The applicant should execute the surety bond (Schedule B) or the penal bond (Schedule C) in triplicate, inserting the amount and indicating the surety or depositary proposed. 3. The applicant should then forward all three copies of the form to the Commissioner of Internal Revenue, who will consider the application and, if he grants it, will *267 sign the permit and return the forms to the applicant. 4. The applicant should then forthwith procure the completion of the bond (Schedule B or C) in triplicate and submit it for approval by the Commissioner, which must be given before the permit will become effective. After the application is approved, one copy will be retained by the Commissioner, one copy returned to the applicant, and one copy will be forwarded to the surety if Schedule B is executed. This application has never been approved by the Commissioner, and the surety bond (Schedule B) has never been completed. On February 19, 1937, the office of the Commissioner addressed a letter to petitioner, the body of which is as follows: Receipt is acknowledged of your application to establish a replacement fund in connection with property condemned for street widening in Flushing, New York. You are advised that your application is being referred to the internal revenue agent in charge at Brooklyn, New York, for verification and comment and that upon receipt of the revenue agent's report the matter will receive prompt attention by this office. In any further correspondence in connection with this matter please refer to IT:B:7-JAPF. *268 The deficiency notice containing the above mentioned holding that petitioner had not established a replacement fund or had not forthwith expended the proceeds in the acquisition of other property similar or related in service or use to the property condemned was mailed to petitioner on March 4, 1941. On June 15, 1932, petitioner purchased from Edna P. Brennan a lease made by Anna Marx to the said Edna P. Brennan, covering three parcels of land and improvements thereon in Flushing, as follows: (a) Southeast corner of Main Street and Washington Street; a plot of land 32 feet by 100 feet improved with a frame building, two stories high and covering the entire plot of land; and occupied by four business tenants. (b) The one-story brick and stone business building known as No. 40-14 Main Street, lot 25 feet by 121 feet irregular, building 25 feet by 81 feet. Building occupied by two business tenants. (c) No. 136-14 Roosevelt Avenue, Flushing; a three-story business building; store on the first floor and rooms above; 26.63 feet by 100 feet irregular. This lease was acquired on June 15, 1932, at a cost of $28,205.38. The term of the lease extended to October 30, 1967. Shortly before *269 September, 1933, the lessors gave to the petitioner as lessee an option to renew the said lease for a further term of 44 years. In September, 1933, petitioner demolished the building on the southeast corner of Main Street and Washington Street, and improved the land with a new one-story brick and stone building containing five stores. The cost of this improvement was $11,780. The leased premises have from time to time been occupied by various sublessees of the petitioner and their occupancies, respectively, have continued for some years. From August, 1932 to January, 1933, petitioner erected on land it already owned twenty-four (24) concrete block one-car garages at the cost of $5,157.80. Each garage was about 12 feet by 25 feet. These garages have each been from time to time rented to various individuals to be used as private garages. From April 6, 1937, to November 30, 1937, petitioner erected on an irregular plot of land having a frontage of 54 feet on the northerly side of Northern Boulevard; 36.45 feet on a triangular side facing the northwest side of Northern Boulevard with a depth of 75.64 feet on the westerly side of Prince Street which it owned at and before the time of *270 the condemnation, a new one-story brick, steel construction building arranged for five stores. This improvement cost $29,201.66. This plot is 80 feet in depth on its northerly boundary and 100.13 feet in depth on its westerly boundary. On November 30, 1937, petitioner acquired adadditional land adjoining the parcel already owned by it, at a cost of $13,731.55. This cost includes the special assessment of $2,231.55 made by the City in 1935 against petitioner's remaining property. Petitioner purchased a mortgage for $50,000 by assignment (mortgage made by the Mansion Realty Company) on May 4, 1936; also, purchased a mortgage by assignment (mortgage known as the Mckeon mortgage) at a cost of $4,250 on October 26, 1932; also, another mortgage by assignment (mortgage known as the Jennie L. Potter mortgage) at a cost of $17,500 on October 26, 1932. All of the costs of the improvements in the above amounts of $11,780, $5,157.80, and $29,201.66, respectively, have been set up on the books of the petitioner as a part of its depreciable costs and depreciation based on these costs has been claimed on the company's returns and allowed by the Commissioner in each year after the year of acquisition. *271 Petitioner owned other properties in addition to the properties condemned. During the period January 1, 1932, to December 31, 1938, there were no acquisitions of land nor improvements of property other than those enumerated above. Petitioner upon receipt of the award money in 1932, 1935 and 1936, respectively, forthwith expended a part of the proceeds thereof in the acquisition of other property similar or related in service or use to the property taken by the City as follows: 1932
$45,143.18
1935
None
1936
40,657.84
Total
$85,801.02
The above amount of $45,143.18 represents the expenditure for the long term leasehold together with the expenditures for the improvements thereon and the cost of the 24 concrete garages. The above amount of $40,657.84 represents (with the exception of $43.82 explained in our opinion) the improvements at Northern Boulevard and Prince Street in the amount of $29,201.66 and the cost of the land in the amount of $11,500, both of which took place in 1937 as explained in our findings above. Petitioner did not segregate or set apart the money which it received as awards for the taking of its properties. The money when received was deposited *272 in petitioner's bank account along with the money it received from other sources. Checks against this account were drawn from time to time during the years 1932 to 1936, inclusive, in payment of petitioner's obligations of all sorts including current expenses, dividends, and expenditures for capital investments. During the years in which the award money was received petitioner paid dividends of $24,000 in 1932, $8,600 in 1935, and $22,500 in 1936. No dividends were paid by petitioner during the years 1933, 1934, 1937 and 1938. Issues (d) and (e). In the deficiency notice the respondent made an adjustment to petitioner's net income for the year 1932 on account of taxes in the amount of $9,427.64, and in a statement attached to the deficiency notice, he explained the adjustment as follows: (b) Inasmuch as you employ the accrual method of accounting, real estate taxes in the sum of $7,675.37 which accrued prior to the taxable year, are disallowed. In addition taxes claimed in the amount of $1,752.27 are disallowed since they constitute assessments for local benefits which should be capitalized. It is held that you are not entitled to an additional deduction of $2,784.28 in *273 1932 for taxes claimed to have been accrued in that year. Issue (f). As found under the first three issues, the City of New York on November 12, 1935, and May 4, 1936, paid petitioner the amounts of $5,015.67 and $32,258.72, respectively, under the heading of interest. On its returns for the years 1932 to 1936, inclusive, petitioner reported as interest income accrued from this source amounts as follows: 1933
$ 7,334.83
1934
7,344.83
1935
7,190.63
1936
15,144.10
$37,014.39
Of the total awards of $213,360, $90,946.20 was paid to petitioner in 1932 leaving a balance of $122,413.80, of which balance $19,144 was paid on November 12, 1935, and $103,269.80 on May 4, 1936. The accruals in 1933 (except for discrepancy of $10) and 1934 represent interest for one year at 6 per cent on the balance of $122,413.80. The accrual in 1935 of $7,190.63 is recorded in petitioner's journal as follows: 6% on $122,413.80
1/1/35 - 11/12
$6,358.81
$103,269.80
11/12 - 12/31
831.82
$7,190.63
For the year 1935, the respondent made "Adjustments to net income" as follows: Net loss as disclosed by return
($12,818.60)
Unallowable deductions and addi-
tional income: (a) Capital gain
15,462.87
Total
$ 2,644.27
Nontaxable income and additional
deductions: (b) Interest income $2,319.16
(c) Depreciation 3.30
2,322.46
Net income adjusted
$ 321.81
*274 In the statement attached to the deficiency notice the respondent explained adjustment (b) as follows: (b) Interest income from condemnation awards was found to have accrued during the taxable year in the sum of $5,015.67 rather than $7,334.83, the amount reported in the return, an overstatement of $2,319.16. It is held that interest received on certain condemnation awards where the amount of the award is in litigation constitutes taxable income in the year the final court decree is entered. For the year 1936, the respondent added to petitioner's net income as disclosed by its return an amount of $19,220.37 as "interest income" which he explained in the statement attached to the deficiency as follows: (a) Interest accrued in 1936 on con-
demnation awards
$32,258.72
Reported in return
13,038.35
Additional income
$19,220.37
It is held that interest received on certain condemnation awards where the amount of the award is in litigation constitutes taxable income in the year the final court decree is entered. Issues (g), (h) and (i). During the taxable years 1936, 1937 and 1938, petitioner paid or incurred salaries to its officers as follows: Officer
1936
1937
1938
W. J. Halleran
$2,400
$2,400
$2,400
Lauretta P. O'Neill
6,000
6,000
6,000
$8,400
$8,400
$8,400
*275 The respondent determined that a total of $1,200 for each year represented "a fair and reasonable allowance for personal services actually rendered within the purview of section 23 (a) of the applicable Revenue Acts" and disallowed the balance of $7,200 in each year (matter in quotation marks from the statement attached to the deficiency notice). Mary Donoghue, Lauretta P. O'Neill, John J. Halleran, William J. Halleran, Laurence B. Halleran, and Thomas Halleran were brothers and sisters. Thomas died prior to 1932 and his widow is Julia M. Halleran. Mary died November 8, 1937, and J. Cyril Donoghue is her son. Lauretta died October 5, 1941. During the period from 1932 to 1938, inclusive, petitioner had issued and outstanding 100 shares of capital stock. During the same period Winter Realty and Construction Company and Twinboro Corporation had issued and outstanding 140 and 100 shares of capital stock, respectively. The ownership of the stock in these corporations were distributed as follows throughout that period: Winter Realty
Flushingside
and
Realty and
Construction
Construction
Twinboro
Company
Company
Corporation
Julia N. Halleran
23 1/3
28 4/7
28 4/7
Laurence B. Halleran
23 1/3
14 2/7
14 2/7
William J. Halleran
23 1/3
14 2/7
14 2/7
John J. Halleran
23 1/3
14 2/7
14 2/7
Mary Donoghue *
23 1/3
14 2/7
14 2/7
Lauretta P. O'Neill
23 1/3
14 2/7
14 2/7
Total
140 shares
100 shares
100 shares
*276 Each member of the Halleran family as enumerated above, except Laurence B. Halleran, was an officer of one or more of the three family-owned corporations. Petitioner's officers from 1936 to 1938, inclusive, were: William J. Halleran, vice president, and Lauretta P. O'Neill, secretary. Laurence B. Halleran was not an officer but acted throughout the entire period as general manager of the petitioner managing the leasing of its properties and generally doing most of the real estate work through his real estate office known as the Halleran Agency. Petitioner, the Winter Realty and Construction Company, and Twinboro Corporation all had their offices in the office of Halleran Agency. The latter made no charge for office rental, telephone service, stenographic help or executing leases, but did charge a commission on collection. Laurence B. Halleran was paid a salary by petitioner of $1,200 in each of the years 1936, 1937 and 1938. William J. Halleran, vice president, had supervision over the maintenance and repairs of the properties. *277 Petitioner also employed a handy man at a wage varying from $36 to $45 per week and a stenographer-bookkeeper at $55 per week. The amounts expended for maintenance and repairs during the period from 1936 to 1938, inclusive, were $778.97, $443.87 and $724.41, respectively. The respondent allowed the deduction of the salaries and wages paid to all employees including Laurence B. Halleran in addition to the above mentioned total deduction of $1,200 each year for salaries of officers. Each member of the Halleran family received a salary from one or more of the three family-owned corporations. The salary paid by each corporation to each stockholder was not the same, but the payments were so arranged that each stockholder (except Julia M. Halleran who owned twice as much stock in two of the corporations) received from the three corporations substantially the same total amount in compensation and dividends. Julia M. Halleran received a larger amount than the others. The balance sheets and statements of income and deductions of petitioner, the Winter Realty and Construction Company and of Twinboro Corporation as disclosed by their respective income tax returns for the years 1932 to 1938, *278 inclusive, have been stipulated as Exhibits 6 and 7 and are incorporated herein by reference. Twenty-four hundred dollars per annum is a reasonable allowance for salaries and other compensation for personal services actually rendered by petitioner's officers in each of the years 1936, 1937 and 1938. Opinion BLACK, Judge: We will consider the issues in the order assigned. Issues (a), (b) and (c). Prior to 1932, the City of New York took by condemnation proceedings certain property owned by petitioner and during the years 1932, 1935 and 1936 paid petitioner a total of $213,360 as compensation (exclusive of interest) for the property taken. This compensation represented a capital gain to petitioner of $109,173.68. Petitioner contends that it is entitled to the benefit of section 112(f) of the Revenue Acts of 1932, 1934 and 1936, and that in accordance therewith no part of this gain should be recognized. Section 112(f) is identical in the three Acts mentioned, and is in the margin. [1] The cases involving section 112(f) and its prototype in other revenue acts are collected and analyzed by Mertens, Law of Federal Income Taxation, Vol. 3, sections 20.120 to 20.129, inclusive. *279 Petitioner contends that the award money it received as a result of the involuntary conversion of its property (Parcels 11, 19 and 20) into money was "forthwith in good faith, under regulations prescribed by the Commissioner with the approval of the Secretary, expended in the acquisition of other property similar or related in service or use to the property so converted * * * or in the establishment of a replacement fund." The respondent contends that neither one of these things occurred, and that, therefore, the entire gain should be recognized. Petitioner does not contend that any of the award money was expended "in the acquisition or control of a corporation owning such other property". The facts and circumstances surrounding the question of the expenditure of the award money in the establishment of a replacement fund are substantially the same as the facts and circumstances surrounding a similar question in Winter Realty & Construction Co., 2 T.C. 38. We held in that case that no part of the award money there received was expended in the establishment of such a fund. For the reasons there given we hold in the instant proceedings that no part of *280 the award money here received was expended in the establishment of a replacement fund. We will next consider whether any of the award money was "forthwith in good faith, under regulations prescribed by the Commissioner with the approval of the Secretary, expended in the acquisition of other property similar or related in service or use to the property so converted." This is a question of fact. Frischkorn Development Company v. Commissioner, 88 Fed. (2d) 1009. We have found in our findings that petitioner did so expend $85,801.02 of the award money which it received. Our findings in this respect are quite full in that they set out in considerable detail the kind of property that was condemned and the kind of property that was acquired in its place. We are satisfied from the evidence that the property acquired in the amount of $85,801.02 was similar or related in service or use to the property taken and have so found as a fact and that it was acquired "forthwith" as required by the statute. Cf. M. J. Caldbeck Corporation, 36 B.T.A. 452. The $71,750 which petitioner invested in mortgages, while expended "forthwith" was *281 not expended in the acquisition of other property similar or related in service or use to the property which the city took. Winter Realty & Construction Co., supra. Since only a part of the award money was expended in the acquisition of other property similar or related in service or use to the property condemned, the last sentence of section 112(f), supra, becomes applicable, and the gain must be recognized "in an amount not in excess of the money which is not so expended". The gain thus to be recognized for the years 1932, 1935 and 1936, computed in line with our holding in Winter Realty & Construction Co., supra, is as follows: 1932
1935
1936
Gross award
$90,946.20
$19,144.00
$103,269.80
Less collection fees and special assessments
6,003.95
3,681.13
12,611.96
Amount that could be expended for similar property
$84,942.25
$15,462.87
$ 90,657.84
Amount that was expended for similar property
45,143.18
None
40,657.84
Amount that was not expended for similar property
$39,799.07
$15,462.87
$ 50,000.00
Gain realized
3,052.97
15,462.87
90,657.84
Gain to be recognized
$ 3,052.97
$15,462.87
$ 50,000.00
*282 After deducting the collection fees and special assessments from the gross awards received in 1932, 1935 and 1936, we have arrived at the above amounts that "could be expended for similar property". That much of our above computation requires no further expeanation. Out of the $84,942.25 award money received in 1932 that could be expended for similar property, petitioner "forthwith" expended $45,143.18 (explained in our findings) for similar property, thus leaving $39,799.07 as not having been expended for similar property. Since this amount is in excess of the gain realized from the 1932 award, the entire gain realized of $3,052.97 is to be recognized. Out of the $15,462.87 award money received in 1935 that could be expended for similar property, we hold that petitioner did not so expend any of that award money, since it made no such expenditures in 1935 or 1936. The expenditures made in 1937 might be considered under peculiar circumstances (Cf. August Buckhardt, 32 B.T.A. 1272, 1276) as having been "forthwith" expended out of the 1935 award money, but the evidence here compels us to find that the 1937 expenditures were made "forthwith" our of the *283 1936 award money to the extent of $40,657.84. Since not any of the 1935 award money was expended for similar property, it follows that the entire gain realized for that year of $15,462.87 should be recognized. Out of the $90,657.84 award money received on May 4, 1936, that could be expended for similar property, petitioner, on May 4, 1936, expended $50,000 of that amount for a mortgage which left only $40,657.84 that could be expended for similar property. The evidence shows that all of this amount and $43.82 of other funds were used to acquire the improvement at Northern Boulevard and Prince Street in the amount of $29,201.66 and additional land in the amount of $11,500. As previously stated the $50,000 expended for the mortgage, while expended "forthwith" was not expended in the acquisition of other property similar or related in service or use to the property taken. Since $50,000 of the 1936 award money was not expended for similar property and since this amount is less than the gain realized of $90,657.84, it follows that under the last sentence of section 112(f), supra, only $50,000 of the gain from the 1936 award should be recognized. Issues (d) and (e). No evidence *284 was offered as to these issues. We, therefore, sustain the respondent's determination as far as these issues are concerned. Issue (f). In its assignments of error petitioner alleges that for the year 1936 the respondent erred "in adding to Petitioner's income as alleged interest an additional amount of $19,220.37." This issue is the same as issues (f) and (h) in $ Winter Realty & Construction Co., supra, except that in the instant proceeding only the year 1936 is involved. We, therefore, hold as to this issue that the difference between the amount received in 1936 and the amount reported in 1936 should be added to petitioner's income for 1936. The parties are in agreement as to the amount that was received in 1936 but differ as to the amount that was reported by petitioner as income in 1936. The respond determined that petitioner reported $13,038.35 as interest received in 1936 whereas petitioner claims it actually reported $15,144.10. The evidence shows that petitioner actually reported the latter amount as interest received in 1936. Upon that basis only $17,114.62 should be added to petitioner's income for 1936 instead of the amount of $19,220.37 *285 determined by the respondent. Issues (g), (h) and (i). Petitioner deducted for each of the years 1936, 1937 and 1938 as officers' salaries an amount of $8,400. The respondent determined that a total deduction of $1,200 for each of the years 1936 to 1938, inclusive, represented a fair and reasonable allowance. The question of what constitutes a "reasonable allowance for salaries or other compensation for personal services actually rendered" allowed as deductions as "ordinary and necessary expenses" in computing net income under section 23(a) of the Revenue Acts of 1936 and 1938, is a question of fact. The evidence on this issue is very much the same as it was concerning a similar issue involved in Winter Realty & Construction Co., supra. In that case the Commissioner in his determination of the deficiencies had allowed the taxpayer a deduction of $2,400 per annum as reasonable for salaries paid to its officers in the taxable years there involved. We upheld the determination of the Commissioner on the ground that the evidence in that case failed to convince us that petitioner was entitled to a greater allowance for salaries to its officers than *286 the $2,400 per annum which the Commissioner had allowed. In the instant case the evidence shows that the business and activities of the petitioner were about the same as were those of the Winter Realty & Construction Co. The services performed by its officers were about the same as in that case. In each case, William J. Halleran was the vice-president and was the outside repair man and supervisor of the properties for all three corporations, Winter Realty & Construction Co., Flushingside Realty & Construction Co. and Twinboro Corporation. It was an all time job for him and his testimony was to the effect that he was at the office from early in the morning until late in the evening, or was busy on the outside as the case may be, and was on call any time day or night when emergency repairs were needed to be made. There were many tenants of the three corporations and their needs and requirements had to be seen after and properly supervised. It seems plain that at least William J. Halleran was one officer who gave his active time and attention to the business of the three corporations which he served, including petitioner. We have, therefore, found on all the facts in evidence that *287 $2,400 per annum was a reasonable amount of allowance for compensation paid to officer by petitioner in each of the years 1936, 1937 and 1938, for services actually rendered by petitioner's officers. See Winter Realty & Construction Co., supra.
Decision will be entered under Rule 50. Footnotes
*. Upon Mary Donoghue's death her stock passed to and has since that time been owned by her heirs J. Cyril Donoghue and three other children in equal shares.↩
1. (f) Involuntary Conversions. - If property (as a result of its destruction in whole or in part. theft or seizure, or an exercise of the power of requisition or condemnation, or the threat or imminence thereof) is compulsorily or involuntarily converted into property similar or related in service or use to the property so converted, or into money which is forthwith in good faith, under regulations prescribed by the Commissioner with the approval of the Secretary, expended in the acquisition of other property similar or related in service or use to the property so converted, or in the acquisition of control of a corporation owning such other property, or in the establishment of a replacement fund, no gain or loss shall be recognized. If any part of the money is not so expended, the gain, if any, shall be recognized, but in an amount not in excess of the money which is not so expended.↩