**STEUART BROTHERS, Inc., a corporation, Petitioner,**

**v.**

**COMMISSIONER OF INTERNAL REVENUE, Respondent.**

**No. 7669.**

United States Court of Appeals Fourth Circuit.

Argued Oct. 9, 1958.

Decided Dec. 17, 1958.

Robert V. Smith, Washington, D. C. (Robert P. Smith, D. A. Baker, Joseph W. Kiernan, and Smith, Ristig & Smith, Washington, D. C., on brief), for petitioner.

Meyer Rothwacks, Attorney, Department of Justice, Washington, D. C. (Charles K. Rice, Asst. Atty. Gen., Lee A. Jackson and Joseph F. Goetten, Attorneys, Department of Justice, Washington, D. C., on brief), for respondent.

Before SOPER and HAYNSWORTH, Circuit Judges, and HARRY E. WATKINS, District Judge.

SOPER, Circuit Judge.

This petition for review presents the contention of the taxpayer that under § 112 of the Internal Revenue Code of 1939, 26 U.S.C.A. § 112, no taxable gain was involved in a condemnation award of $425,000 from the United States whereby the taxpayer realized a gain of $349,058.54. The statute provided:

> "§ 112. Recognition of Gain or Loss.— * * *
>
> "(f) *Involuntary Conversion.* If property (as a result of its destruction in whole or in part, theft, seizure, or requisition or condemnation or threat or imminence thereof) is compulsorily or involuntarily converted—
>
> "(1) *Conversion into similar property.* Into property similar or related in service or use to the property so converted, no gain shall be recognized."

Since the property was taken by the United States in a condemnation proceeding the first requirement of the statute was satisfied; but the Tax Court held that the property had not been converted into property similar or related in service or use to the property condemned and therefore approved a determination of a tax deficiency of $81,162.37 for the calendar year 1951.

Steuart Bros., Inc., a Delaware corporation, has been engaged in the real estate business in Washington, D. C., since January 2, 1925, consisting principally of acquiring improved and unimproved realty for investment purposes. The taxpayer constructed buildings for rental purposes on vacant land designed for a variety of purposes according to its own plans or the specifications of the lessees. Substantially all of the taxpayer's income has been derived from the rental of investment property.

Early in 1948, the taxpayer purchased approximately four and one-half acres of commercially zoned vacant land at East Capitol Street and Blaine Street, S. E., near Kenilworth Avenue, west of the Pennsylvania Railroad tracks in northeast Washington. The land cost $33,181 and the taxpayer spent the additional sum of $37,750.46 in clearing and preparing it for commercial use, making the total investment $70,941.46. In the summer of 1949, the taxpayer entered into a written agreement with Square Deal Market Company, Inc., an operator of a chain of retail grocery stores, to construct a large one-story building on the southwest portion of the land for use as offices, warehouse, and storage space and leased it to Square Deal for the period of ten years with certain extensions. On December 13, 1949, the taxpayer filed with the officials of the District of Columbia an application for a permit to erect the building, but the permit was refused because the officials intended to take this portion of the property by condemnation for the purpose of extending East Capitol Street in conjunction with the erection of the East Capitol Street bridge.

Early in 1950, the taxpayer entered into a written agreement with Manor Real Estate and Trust Company to construct a large one-story warehouse, with parking area on the remainder of the land to be leased to the Manor Company for the term of 10 years, renewable on a monthly basis. Accordingly, on September 18, 1950, the petitioner filed an application with the Washington officials to erect the building, but the permit was refused because the officials intended to condemn this portion of the land also in order to provide access to the East Capitol Street bridge.

Thereafter the entire property was condemned and on December 18, 1950, the taxpayer was granted an award of $425,000 by the District of Columbia and realized the gain in question. The entire sum was deposited in a special banking account.

During 1951 and the early part of 1952, the taxpayer investigated vacant land as well as improved realty in the Washington metropolitan area for the purpose of replacing the condemned property. On June 5, 1952, taxpayer purchased for $376,170 property at 1401 Rhode Island Avenue, N. E., on part of which was located a one-story building used as automobile salesrooms, garage, and service station, the remainder of the property being used as a parking and used-car lot. At that time the property was under a lease (expiring in 1956) to an automobile dealer, and since 1956 has been leased to Continental Motors, Inc.

On December 31, 1952, the taxpayer purchased from Continental Oil Company two parcels of property for the total purchase price of $236,425.28, one of which is located at Third and H Streets, N. E., and the other at Fourteenth and Swann Streets, N. W., in Washington. The Third Street property is improved by two one-story buildings used as automobile showrooms, automotive repair shop, garage and service station, and the vacant portion of the land is used as a parking and used-car lot. It was then under lease to Steuart Motor Co., Inc., an automobile dealer, and is still under lease

to that company. The Fourteenth Street property is improved by a two-story building used as a service station and was under lease at the time of its acquisition to an individual named Bonifant. It is now leased to the operator of a fleet of taxicabs. The award of $425,000 was expended as follows:

| | |
|---|---|
| Attorney's fee .............. | $ 5,000 |
| Purchase of Rhode Island Avenue property .......... | 376,170 |
| Part payment of the purchase price of the Third and Fourteenth Street properties .... | 43,830 |

The balance of the purchase price of the last named properties, amounting to $192,655.58, was supplied by the taxpayer from other funds.

The question that is proposed is whether real property, held by the owner for investment but condemned for public use, is converted into similar property within the meaning of the statute when the proceeds of the award are invested in other real property of the same general character. On the face of the matter, the answer would seem to be in the affirmative because the obvious purpose of the law is to relieve the owner of property of the immediate payment of a capital gains tax when he does not liquidate his holding of his own will but parts with it involuntarily by virtue of superior governmental power, or loses it through circumstances over which he has no control. The Tax Court has taken a narrower view. It agrees that exact duplication of converted property is not required but it holds that the new property must be put to a functional use similar to that of the old so that, in the words of the statute, there is a "conversion into property similar or related in service or use to the property so converted." It says that it is not enough for the taxpayer to show that he is in the business of acquiring and holding real property for investment and that both the old and the new property were actually held for that purpose.

We had occasion to apply the statute in Lynchburg National Bank & Trust Co. v. Commissioner, 4 Cir., 208 F.2d 757. The bank, in order to increase the size of its quarters, purchased the adjacent property intending to demolish the building on it and to erect an addition. But the plan was delayed by the war and the bank rented the old building to tenants, in part for a shoe store and in part for a restaurant. Subsequently half the building was damaged by fire and torn down and later the remainder of the building was demolished and the addition to the banking house was built. The bank claimed that the case was covered by the statute and hence the proceeds of the fire insurance policy on the burned building should not be included in computing its income for the year when they were received. We rejected this contention, holding that the uses to which the property was put before and after the change were not so similar as to bring the case within the terms of the statute. Before the fire and the demolition of the original building the property served as an investment of the bank and was used by the bank's tenants for a shoe store and a restaurant, while afterwards it was used by the bank itself as its place of business. The present case does not present such a dissimilarity. The taxpayer's vacant land on East Capitol Street had been definitely committed by contract to specific uses, which should be compared with the uses to which the land purchased with the proceeds of the condemnation award was actually devoted.[1] Two buildings were designed for

1. Under these circumstances it would be unreasonable to apply the provision of Treasury Regulations 111, § 29-112(f)-(i), which declares that there is no investment in property similar in character if the proceeds of unimproved real estate are invested in improved real estate. The Tax Court made a similar holding in Gaynor News Co., 22 T.C. 1172, 1179, where the taxpayer demolished a building in order to erect a new building for its business and after the land was cleared and before the new building was erected the property was condemned and the taxpayer bought new real estate on which there were improve-

the original tract: (1) a one-story building to be leased to and used by a retail grocery store, and (2) a one-story warehouse to be leased to the Manor Real Estate and Trust Company. The new properties were devoted generally to usages of the automobile business, the Rhode Island Avenue and Third Street properties for automobile showroom, repair shop, garage-service station, and parking lot by an automobile dealer; the Fourteenth Street property as a service station by the operator of a fleet of taxicabs. A comparison between these uses would be relevant if the taxpayer itself had used or intended to use the original land for the planned purposes and later, after the condemnation, had itself used the new land in the same way as its tenants used it. But the taxpayer was not in possession and did not itself actually use the newly acquired properties for any purpose. It held them for an investment exactly as it had previously held the condemned properties; and it is manifest that the purpose of the statute will be served if the taxpayer is not compelled at this time to recognize the gain which it was compelled to realize by the condemning power.

Prior decisions of the Tax Court have adopted this view. In M. J. Caldbeck Corp., 36 B.T.A. 452, the taxpayer owned an opera house which had been remodeled to provide two stores on the ground floor and a moving picture theatre above. After a fire which destroyed the building the taxpayer leased the property and agreed to construct a new building to be used by the tenant for a department store. The decision went against the taxpayer because the replacement of the investment was not made "forthwith" as required by the provisions of the section as it appeared in the Internal Revenue Act of 1932. But in passing on the comparative uses of the property the Tax Court said (at page 454):

> "We think it beyond serious question that the old and the new buildings were 'similar or related in service or use' within the meaning of the statute. Both were business properties; in the old, part of the income was from rents from stores on the ground floor and part from the operation of a motion picture theater; in the new, the income was from rents from ground floor stores. There were differences in the type of construction and the height and depth of the buildings, but the statute does not require exact physical duplication. Cotton Concentration Co., 4 B.T.A. 121."

Again in Winter Realty & Construction Co. v. Commissioner, 2 T.C. 38, the Tax Court had occasion to consider the case of a realty company which owned five parcels of real estate that were condemned by the City of New York. It invested part of the condemnation award in mortgages and part in real estate. It was held that the mortgages were not similar properties but that the new real estate was similar to the old within the meaning of the statute. A comparison of the old and new properties shows that they differed from each other quite as much as the old and new properties in the instant case. Winter's original properties included a bicycle repair shop, a motorcycle salesroom, a brick warehouse, a concrete garage, a frame shop occupied by an automobile accessory business and a two-story frame residence, and a store occupied as a barber shop, a frame dwelling containing nine apartments, hard-

ments, some of which were retained for the conduct of the business. The court said: "* * * In the case before us, the function and purpose of the old property, from petitioner's perspective, was identical with that of the new. The mere fact that the old property was bare of improvements at the precise moment of conversion, while the new property had, when acquired, improvements fortuitously useable, in part, in furtherance of petitioner's clearly planned purposes (but to a substantial extent unusable, and actually an obstruction when viewed in the light of intended use) does not alter the basic identity of function, purpose, and use for which both the old and new property were acquired by petitioner."

ware store, cigar store, tailor shop, etc. The new properties consisted of a brick building erected on a lot owned by the taxpayer occupied on the lower floor by butcher, liquor and barber shops, and on the upper floor by a chiropodist's office, an employment office, and a Christian Science Reading Room. Other new properties consisted of vacant land on which the taxpayer erected buildings or intended to erect them, also a building divided into four stores and, also, a building used in part as a café. In passing on the similarity of the uses of the property, the Tax Court said:

> "We have found in our findings that the petitioner did so expend $96,830.19 of the award money which it received. Our findings in this respect are quite full in that they set out in considerable detail the kind of property that was condemned and the kind of property that was acquired in its place. We are satisfied from the evidence that the property acquired in the amount of $96,830.19 was similar or related in service or use to the property taken, and have so found as a fact, * * *".

The Tax Court cites a number of decisions in which it found that the required similarity of use did not exist; but in these cases the use of the property by the taxpayer itself before the involuntary conversion took place was compared with the use of the new property by the taxpayer itself thereafter.[2] There was no comparison of investments in real estate held by the taxpayer before and after the conversion, but not used by the taxpayer itself. In our view the taxpayer in the present case is entitled to the benefit of the statute because the original real estate was held by it for investment purposes and the proceeds of the condemnation were reinvested in real estate of the same general class.

The decision of the Tax Court will be reversed.

Reversed.

2. See Buckhardt v. Commissioner, 32 B.T.A. 1272; Cotton Concentration Co. v. Commissioner, 4 B.T.A. 121; Flaxlinum Insulating Co. v. Commissioner, 5 B.T.A. 676; Haberland v. Commissioner, 25 B.T.A. 1370; Kimball-Diamond Milling Co. v. Commissioner, 10 T.C. 7; Massillon-Cleveland-Akron Sign Co. v. Commissioner, 15 T.C. 79; Nehi Beverage Co. v. Commissioner, 16 T.C. 1114; Washington Market Co. v. Commissioner, 25 B.T.A. 576.