SOL LUIS DESCARTES, TREASURER OF PUERTO RICO, Petitioner, v. TAX COURT OF PUERTO RICO, Respondent; CARMELINA CERRA WIDOW OF FERNÁNDEZ GARCÍA, ETC., Intervener.

No. 284. Argued November 14, 1952.—Decided April 13, 1953.

---

532

533

*Víctor Gutiérrez Franqui, Attorney General,* and *Manuel J. Medina Aymat, Assistant Attorney General,* for petitioner. *Juan A. Faría* for intervener, plaintiff in the main action.

MR. JUSTICE PÉREZ PIMENTEL delivered the opinion of the Court.

Carmelina Cerra widow of Fernández García filed a complaint in the former Tax Court of Puerto Rico against Sol L. Descartes, Treasurer of Puerto Rico, alleging that she is the judicial administratrix of the heirs of Dr. Eugenio Fernández García, who died on May 27, 1946; that Dr. Fernández García owned a property located at 25 San Francisco Street, in San Juan, which he had acquired for the sum of $18,000; that on February 5, 1946, the Government of

Puerto Rico instituted condemnation proceedings in connection with said property and deposited in court, as its estimate of a just and reasonable compensation, the sum of $30,000; that on March 5, 1946, Manuel García, a lessee of that property, moved for intervention in the said condemnation suit claiming $16,462.17 for damages sustained on account of said proceeding; that on October 23, 1946, Arturo Torres, a sublessee, also intervened in the suit; that prior to his death, Dr. Fernández García filed an answer to the complaint in the condemnation case alleging that the fair value of the property was $50,000; that on May 6, 1949, judgment was entered in said suit assessing just compensation at $32,000, of which sum $31,500 were awarded to the property and $500 to Manuel García, the intervener lessee; that said judgment became final and unappealable on June 5, 1949. She alleged furthermore that on January 26, 1950, as the judicial administratrix of the properties of the heirs of Dr. Eugenio Fernández García she asked the Treasurer of Puerto Rico for permission to establish a replacement fund in connection with the condemned property, which permission the Treasurer denied on March 9, 1950, on the ground that over four years had already elapsed since the condemnation. The complaint ends by praying that it be decided that the Treasurer of Puerto Rico abused his discretion in denying the request to establish the replacement fund and that, consequently, the respondent be ordered to permit the plaintiff to establish said fund.[1]

The Treasurer moved for the dismissal of the complaint on the ground that (a) the Tax Court lacked jurisdiction to

[1] Section 6b (5) of the Income Tax, Act No. 74 of August 6, 1925 (Sess. Laws, p. 400) as amended, authorizes the creation of said replacement fund. The procedure to be followed in order to obtain the establishment thereof is set forth in § 31 of the Regulations of the Income Tax Act prescribed by the Treasurer. The purpose of those provisions is to avoid the payment of income taxes on gains obtained in cases where, as here, there has been an involuntary conversion of property. To this effect, see *Francis* v. *DuPont, et al., Executors,* 31 B.T.A. 278.

take cognizance of the case because the action of the Treasurer in denying the establishment of the replacement fund was not reviewable by that court; (*b*) because the action brought by the plaintiff was premature since no judicial controversy had yet arisen which might bring about an order of that court; and (*c*) because the plaintiff lacked juridical standing to appear before the court.

The court *a quo* denied said motion to dismiss as a whole whereupon the respondent answered accepting the essential facts of the complaint, except that he alleged, to the contrary, that on February 5, 1946, the proceeds of the condemnation were placed at the disposal of Dr. Eugenio Fernández García, and that it was on April 4, 1950, and not on January 26 of that year that the plaintiff asked leave of the Treasurer to establish the replacement fund. He also reproduced the defenses he had previously set up in his motion to dismiss and as new matter in opposition he alleged that simultaneously with the denial in connection with the establishment of the replacement fund, he notified the plaintiff of a deficiency increasing the income shown on the return by $13,581.39 as profit in the aforesaid condemnation and that the plaintiff moved for an administrative reconsideration of said notice of deficiency, the matter being pending at the filing of the complaint.

Subsequently the plaintiff filed a motion in the court *a quo* alleging that notwithstanding the order of that court denying the motion to dismiss filed by the Treasurer, the latter notified her, on August 23, 1941, of a final deficiency in the amount of $12,778.82 based on the gain obtained in the sale of the property involved in the condemnation proceeding. This motion ended by praying that the Treasurer be ordered to set aside the aforesaid notice of deficiency until the court decided the case and without prejudice on the Treasurer's part to make a new notice of deficiency in case the court dismissed her complaint. On the same day set for the trial on

the merits, the court *a quo* granted the foregoing motion and ordered that the said notice of deficiency be stayed until judgment was rendered.

The parties submitted the case on the pleadings, presenting as the only evidence the letter from the Treasurer to the plaintiff, dated May 9, 1950, refusing permission to establish the replacement fund. That letter reads:

Heirs of Dr. E. Fernández García
Box 18
Hato Rey, Puerto Rico.

 Re: Request to establish Replacement Fund

Gentlemen:

In answer to your request above stated you are hereby informed that this office denies same, inasmuch as over four years have elapsed since the date of the condemnation and you may not therefore avail yourselves of the provisions of § 6 (b–5) of the Income Tax Act.

Very truly yours,
Treasurer of Puerto Rico
By: (Sgd.) ANTONIO LALOMA, JR.,
Chief of the Bureau.

Thereafter the court *a quo* entered judgment granting the complaint and quashed the Treasurer's decision refusing to grant the taxpayers, the heirs of Dr. Eugenio Fernández García, permission to establish the replacement fund and in addition set aside the tentative notice of deficiency made on account of that refusal.

At the request of the Treasurer we granted certiorari to review the aforesaid judgment. The petitioner claims that the lower court committed the following errors:

"1.—Deciding that the petitioner has juridical standing to sue in the instant case.

"2.—Deciding that it has jurisdiction to take cognizance of the instant case.

"3.—Deciding that the action brought by the plaintiff is not premature.

"4.—Deciding that the petitioner erred in refusing to grant permission for the establishment of the replacement fund.

"5.—Setting aside, without authority therefor, the tentative determination of a deficiency notified by the petitioner to the plaintiff, simultaneously and as a result of his refusal to permit the creation of the replacement fund."

█ In discussing the first error the petitioner argues that since the names of the persons who compose the heirs of Dr. Eugenio Fernández García are not set forth in the complaint, the intervener lacked juridical standing to appear before the court *a quo*. In support of his contention he invokes the case of *Heirs of Dr. Eugenio Fernández García* v. *Tax Court of Puerto Rico, Rafael Buscaglia, Treasurer of Puerto Rico, Intervener*, per curiam decision of June 7, 1949. In that case we ratified once more our opinion that it is a well-settled doctrine that an estate, (*sucesión*) as a juridical person, does not exist in our law. Consequently, in order that an estate may sue or be sued, the names of the members thereof must be expressed individually or in detail inasmuch as they and not the estate should appear as plaintiffs or defendants. *Heirs of Belaval* v. *Acosta*, 64 P.R.R. 104.

The foregoing doctrine is not applicable to the case at bar. Here the plaintiff is Carmelina Cerra widow of Fernández García, judicial administratrix of the heirs of Dr. Eugenio Fernández García, and not the succession. As such administratrix it is her duty to represent the decedent in all legal proceedings begun by or against him before his death, and in those which may be instituted afterwards by or against the inherited estate. Section 584 of the Code of Civil Procedure (1933 ed.) In the intestate succession this representation is exclusive until the declaration of heirship is made. Thenceforth, as in the case of a testate succession, the judicial administrator, by virtue of the representation conferred on him by law, and the heirs, as real parties in interest, must act jointly in all actions brought by or against the hereditary estate. *Franceschi* v. *District Court*, 45 P.R.R.

646. In the instant case, however, the petitioner did not show before the court *a quo* that when the complaint was filed such declaration of heirship had already been made or that the decedent had died under a valid designation of heirs by will. In the absence of a showing of these facts the plaintiff could sue by herself. Furthermore, Rule 17(c) of the Rules of Civil Procedure authorizes the administrator to sue without joining with him the persons for whose benefit the action is prosecuted.

The first error was not committed.

■■ The second and third errors may be discussed jointly since the question raised by both is the same, namely, the lack of jurisdiction of the trial court.

The Treasurer claims that his decision refusing to give the taxpayers permission to establish the replacement fund was not appealable to the Tax Court of Puerto Rico. He argues that despite the broad and exclusive jurisdiction conferred on said court by the Act creating it—Act No. 328 of May 13, 1949—to take cognizance of all cases, actions and proceedings, or special or extraordinary remedies, in connection with, or affecting, the levy, collection and payment of all kinds of taxes,[2] the procedure to enforce that jurisdiction is fixed by Act No. 235 of May 10, 1949, and that as to income taxes, an appeal may be taken only (1) from a final

---

[2] Section 2 of said Act No. 328 of 1949, insofar as pertinent, provides that:

"In addition to the jurisdiction therein vested by special laws, the Tax Court of Puerto Rico shall have exclusive jurisdiction to take cognizance of all cases, actions and proceedings, or special or extraordinary remedies, in connection with, or affecting, the levy, collection and payment of all kinds of taxes, including property taxes, inheritance and gift taxes, income taxes, unfair profiteering taxes, social insurance taxes, excises, license taxes, and any other taxes or imposts, as well as to take cognizance of claims for taxes collected by unlawful procedure or which voluntarily, or without notice from the Treasurer of Puerto Rico were paid unduly or in excess, the reimbursement of which is authorized by law and is refused by the Treasurer of Puerto Rico; *Provided, however,* That this jurisdiction may not be pleaded before the court by any person until there has been a proper administrative decision in the matter on the part of the Treasurer of Puerto Rico in accordance with law; . . ."

determination of a deficiency notified in the manner provided for in § 57(a) of the Income Tax Act of 1924, and (2) from a final decision denying a claim in abatement, notified in the manner provided for in § 62.(b) of said Act.[3] He also argues that since this case does not involve either of those two actions, the taxpayers resorted prematurely to the Tax Court.

If we have understood well, the Treasurer's contention is to the effect that the taxpayers could only litigate the decision refusing permission to establish the replacement fund, within the appeal that might be taken from the final determination of a deficiency notified to said taxpayers. We disagree. The exclusive procedure established in § 2 A of

---

[3] Section 2 A of Act No. 235 of 1949, provides that whenever a taxpayer disagrees with a decision notified to him by the Treasurer of Puerto Rico, and is by law entitled to appeal therefrom, he shall do so in the manner, within the term, and upon compliance with the requirements set forth in said Section. As to income taxes, these requirements are those established in the first subdivision of that Section. Said subdivision reads:

"1. *Income Tax.*

"From a final determination of a deficiency notified in the manner provided for in Section 57(a) of the Income Tax Act of 1924, or from a final decision denying a claim in abatement, notified in the manner provided for in Section 62(b) of said Act, by filing complaint in the Tax Court of Puerto Rico, in the manner provided for by the law creating said court, within the term of thirty (30) days, from the date of mailing said notice of the final determination of the Treasurer of Puerto Rico, after giving bond in favor of the latter and before him, subject to the approval of said official, for the amount of the tax notified, plus interest computed for a period of one (1) year at the rate of six per cent (6 %) per annum; *Provided, however,* That the taxpayer may pay that part of the tax to which he agrees and file complaint for the remainder in the Tax Court of Puerto Rico, in the manner aforesaid, upon giving the bond above mentioned, for the amount of the tax in litigation, plus interest computed for a period of one (1) year, at the rate of six per cent (6 %) per annum; *And provided, further,* That whenever a final decision of the Treasurer of Puerto Rico denying a claim in abatement is appealed from, the taxpayer shall not be under obligation to give the bond required by this Section, if the bond accompanying the claim in abatement guarantees, in the judgment of the Treasurer, the tax assessed, to its payment in full; *And provided, finally,* That both the term of thirty (30) days within which to appeal to the Tax Court of Puerto Rico, and the giving of the bond above mentioned, where such bond is required, within the said term of thirty (30) days, shall be considered of a jurisdictional character."

Act No. 235 of 1949, is limited, as regards income taxes, to the two actions of the Treasurer expressly set forth in said section, to wit, a final determination of a deficiency or a final decision denying a claim in abatement. In those cases the procedure provided for in said Act is mandatory. Nevertheless, that Act fixes no procedure whatsoever to appeal to the Tax Court from an administrative decision of the Treasurer refusing permission to establish a replacement fund. In these cases it is the very Act creating the Tax Court which points out the procedure to be followed. See § 3 of Act No. 328 of 1949. On the other hand, the language of this Act No. 328 is so broad and sweeping, as to the jurisdiction conferred on the Tax Court, that its construction does not allow the exclusion of an action as that brought by the taxpayers. By virtue of that jurisdiction said court may take cognizance of all cases, actions, proceedings, etc., *in connection with, or affecting*, the *levy*, collection and payment of all kinds of taxes, including, of course, income taxes. See footnote 1. The establishment of a replacement fund as authorized by § 6(*b*) (5) of the Income Tax Act and § 31 of its Regulations, is the means the taxpayer has to prevent, whenever proper, that a gain be recognized and consequently a tax levied. A refusal of the Treasurer to permit the establishment of such fund results in the recognizing of that gain and the levying of the tax.[4] The Treasurer's decision is so *connected* with the *levy* of the tax and the former *affects* the latter to such an extent that, if said decision had been favorable to the taxpayers, the Treasurer would have been devoid of any ground to levy said tax. What the taxpayers could not do, and this fortifies our reasoning, was to appeal to the Tax Court before there had been a proper administrative decision in the matter on the part of the Treasurer. For these purposes the Act creating that court provides in

---

[4] In fact, it so happened here. The Treasurer refused permission and simultaneously notified the taxpayers of a tentative deficiency.

§ 2 that: *"Provided, however,* That this jurisdiction may not be pleaded before the court by any person until there has been a proper administrative decision in the matter on the part of the Treasurer of Puerto Rico in accordance with law; . . ." It was from the administrative decision of the Treasurer refusing permission to establish the replacement fund that the taxpayers appealed to the Tax Court.

Finally it is proper to point out that Act No. 235, cited by the Treasurer as the Act fixing the exclusive procedure to appeal to the Tax Court, does not have the scope of extending or limiting the jurisdiction of that court. To this effect, § 5 of said Act provides:

"Section 5.—This Act shall not be construed in the sense of extending or limiting the jurisdiction or competence of the Tax Court of Puerto Rico, nor the rights granted to or the obligations imposed by law on the taxpayers, The People of Puerto Rico, or the officials of The People of Puerto Rico."

The second and third errors were not committed either.

 The fourth error assigned is directed to the merits of the case. In its conclusions of law the court *a quo* points out that:

". . . . . the decision of this case depends mainly on a question of fact, that is, the date on which the heirs received and had the free use of the proceeds of the condemnation in order that we may determine whether they complied with the Act and the Regulations, for the purpose of establishing the replacement fund forthwith. It is alleged in the complaint that on February 5, 1946, the Government filed the complaint in the condemnation case and deposited in court $30,080 as just and equitable compensation, and it is alleged in the answer that on. February 5, 1946, the proceeds of the condemnation were placed at the disposal of Dr. Eugenio Fernández García. However, the fact that the money was deposited in court on that date does not forcibly lead to the conclusion that the taxpayer received on that date and had since then the free use of said money. So much so that it is alleged in the complaint that on March 5, 1946, a lessee intervened in the suit claiming damages in the·

amount of $16,462.17 on account of the condemnation, and that on October 23 of that same year, a sublessee also intervened, although we do not know in what said intervention consisted. It also appears that it was not until May 6, 1949, that the Court of Eminent Domain disposed of the lessee's intervention, awarding him $500 of the $32,000 that were finally fixed as compensation by the judgment that became final and unappealable on June 5, 1949. The Treasurer does not deny these facts.

"It is not quite clear from those averments of the complaint whether the lessee's intervention prevented the taxpayers from freely using or disposing of the amount originally deposited. In other words, it can not be ascertained whether the lessee's claim was directed against the amount deposited, in which case the really adverse party was the taxpayers, or whether on the contrary the claim was against the Government and in addition for the amount deposited. Since the property had cost $18,000 the gain obtained prima facie, taking as a basis the compensation originally deposited in 1946, amounted to $12,080. Had the lessee fully prevailed, his $16,462.17 claim could have absorbed the capital gain. Hence, the taxpayers could not be then in a position to dispose of said gain for any purpose whatsoever, neither to acquire another property, nor to establish a replacement fund. They had by perforce to await the outcome of the intervention suit. If on the contrary, the intervener's claim was against the Government in addition to the amount deposited, it would not have precluded the plaintiff from making use in 1946 of the compensation and of the gain."

The petitioner challenges those conclusions and, on the contrary, alleges that "ever since February 5, 1946, when the People of Puerto Rico filed the complaint in the condemnation suit and deposited in court the compensation it deemed just and equitable ($30,080), Dr. Eugenio Fernández García could freely dispose of said sum" and that the latter should have requested immediately thereafter the creation of the replacement fund. He is not correct. We have already indicated that a lessee had intervened in the condemnation suit claiming $16,462.17 as damages arising out of the condemnation. Said claim for damages was directed against

the amount deposited. This is so because the amount deposited as compensation takes the place of the land or immovable. A third party having a lien or encumbrance upon or an interest in the property may therefore obtain that said lien or encumbrance or interest be satisfied out of the amount deposited as compensation.[5] See Nichols, *On Eminent Domain*, Vol. 2, § 5.3, p. 50 and 5.74, p. 84 (3d ed.). Therefore, the Court of Eminent Domain had first to decide the case and enter judgment in order that the owner could then ask for the distribution of the amount in accordance with the terms of the judgment itself. *United States* v. *Certain Parcels of Land*, 40 F. Supp. 436. The petitioner alleges that, even accepting that doctrine, the refusal of the Treasurer was still well founded inasmuch as the judgment of the Court of Eminent Domain became final and unappealable on June 5, 1949, and it was not until ten months later—on April 4, 1950—that the judicial administratrix asked permission for the establishment of the replacement fund. It therefore follows that the Act was not complied with insofar as it requires that for the gain in a condemnation case not to be recognized, the money must be *forthwith* expended[6]

---

[5] As a matter of fact, the Court of Eminent Domain assessed the fair value of the property at $32,000 of which it awarded $500 to the intervener lessee.

[6] Section 6 of the Income Tax Act, insofar as pertinent, provides as follows:

"Section 6.—Upon the sale or exchange of property the entire amount of the gain or loss, determined under Section 5, shall be recognized, except as hereinafter provided in this Section.

" . . . . . . . .

"(5) If property (as a result of its destruction in whole or in part, theft or seizure, or an exercise of the power of requisition or condemnation, or the threat or imminence thereof) is compulsorily or involuntarily converted into property similar or related in service or use to the property so converted, or into money *which is forthwith* in good faith, under regulations prescribed by the Treasurer, *expended* in the acquisition of other property similar or related in service or use to the property so converted, or in the acquisition of control of a corporation owning such other property, *or in the establishment of a replacement fund,* no gain or loss shall be recognized. If any part of the money is not so expended, the gain, if any, shall be recognized, but in an amount not in excess of the money which is not so expended." (Italics ours.)

in the acquisition of other property similar or related in service or use to the condemned property or in the acquisition of control of a corporation owning such other property, or in the establishment of a replacement fund. The intervener alleges on her part that since it was not until December 30, 1949, that the inheritance tax on the estate of Dr. Eugenio Fernández García was liquidated and paid, the petition for the creation of the replacement fund made on April 4, 1950, was timely, only a little over three months having elapsed between the one and the other dates. The intervener relies on the provisions of Act No. 303 of April 12, 1946 (Sess. Laws, p. 782) whose § 12, as amended by Act No. 189 of May 13, 1948 (Sess. Laws, p. 526) recites: ". . . no court shall approve the partition or distribution of the estate of any decedent or allow any final settlement of the accounts of any executor, administrator, trustee or person administering any estate, unless the special receipt or receipts as provided in Section 11 of this Act, have been produced and exhibited; . . . ," that is, the receipts verifying payment of the inheritance tax. We need not decide here whether intervener's contention is valid, namely, whether the Court of Eminent Domain could refuse to deliver the amount deposited until it was shown the aforesaid receipts. It is enough to point out that no suggestion has been made here that the intervener did not proceed in good faith. *August Buckhardt,* 32 B.T.A. 1272, 1275; *The Henderson Overland Co.,* 4 B.T.A. 1088, 1092. It is likewise significant that the date taken into consideration in condemnation cases to determine whether the taxpayer has made the conversion "forthwith" has been the date on which he *received* the compensation. *August Buckhardt, supra; The Henderson Overland Co., supra; Paul Haberland,* 25 B.T.A. 1370. See also *United States* v. *Certain Lands in Borough of Brooklyn,* 129 F. 2d 577. We therefore hold that the date we must consider in the case

at bar to determine whether the taxpayers acted "forthwith" as required by the statute, is December 30, 1949.[7]

From that date—December 30, 1949—until April 4, 1950, when the taxpayers asked permission for the establishment of the replacement fund, three months and several days had elapsed. Is that period too long to determine that the petition was not made forthwith? The Act, in its English version—which is the original—and which we must follow for reasons of legal construction, § 13 of the Civil Code (1930 ed.); *Pérez* v. *District Court*, 69 P.R.R. 4; uses the word "forthwith" whose meaning is broader than that of the word "*inmediatamente*" used in the translation into Spanish of the Act and in the Regulations of the Treasurer. *August Buckhardt, supra; Chickasha Cotton Oil Co.*, 18 B.T.A. 1144; *Paul Haberland, supra; Dieckerman* v. *Northern Trust Co.*, 176 U.S. 181. The meaning of that term, in a particular case, depends on the circumstances surrounding it, and an apparent delay may be satisfactorily explained. *The Henderson Overland Co., supra; The Davis Co.*, 6 B.T.A. 281; *Paul Haberland, supra; August Buckhardt, supra.* In the case with which we are concerned, the taxpayers have not offered any explanation nor given the reasons wherefore they let three months and several days elapse before asking permission for the establishment of the aforesaid fund. Nevertheless, it must be taken into account that the provision under examination is a relief provision, *August Buckhardt, supra; Washington Market Co.*, 25 B.T.A. 576; *Paul Haberland, supra; International Boiler Works Co.*, 3 B.T.A. 283; and as such we must construe it liberally to effectuate its purposes. *Bonwit-Teller & Co.* v. *United States*, 233 U.S. 258. We therefore hold that the taxpayers, in this case, acted

---

[7] The record does not disclose that by that time the heirs of Fernández García had *received* the compensation fixed by the Court of Eminent Domain. We assume, however, that at that time and pursuant to the very opinion of the judicial administratrix, the heirs could freely dispose of said compensation.

with due diligence, *August Buckhardt, supra*, and that under the circumstances, their apparent delay was not unreasonable.

 The fifth error was committed. The judgment appealed from sets aside the determination of a deficiency for the year 1946, notified to the taxpayers on March 9, 1951. By its interlocutory order of September 11, 1951, the court *a quo* had stayed the effects of said notice of deficiency. On neither of these two occasions the taxpayers were required to give a bond on the tax in controversy, including interest and penalties.

In the first place, the determination of a deficiency notified to the taxpayers is not litigated here, despite the fact that said deficiency arose as a result of the Treasurer's decision refusing the establishment of the replacement fund. To litigate said deficiency the taxpayers were bound to follow the procedure assigned in Act No. 235 of 1949, and to meet the requirements of said Act, but they did not do so.

In the second place, the appeal taken from the Treasurer's administrative decision refusing the establishment of the replacement fund, did not preclude said officer from making and notifying the proper determination of a deficiency or from proceeding with the administrative procedure until collection of the tax was obtained. Section 3 of the Act creating the Tax Court—Act No. 328 of May 13, 1949— [8] provides that in all actions, remedies or proceedings to be substantiated before the Tax Court, the filing of the complaint shall not affect or impair the right of the Treasurer

---

[8] The first *Provided* clause of said Section reads:

". . . *Provided, however,* That the filing of the complaint in the Tax Court shall not affect or impair the right of the Treasurer of Puerto Rico to collect the taxes by the procedure authorized by law, unless the Tax Court, upon motion of the taxpayer and after summoning the Treasurer of Puerto Rico, stays the collection of the tax at issue, upon the bonding, to its entire satisfaction, of the tax in controversy, including interest and penalties. The authorization to file this bond, as well as the fixing of the amount thereof, shall be a discretional and exclusive faculty of the court, having in mind in each case the facts and circumstances in its judgment concurring and affecting the interest both of the taxpayer and The People of Puerto Rico."

of Puerto Rico to collect the tax by the procedure authorized by law, unless the Tax Court, upon motion of the taxpayer and after summoning the Treasurer of Puerto Rico, stays the collection of the tax at issue upon the bonding, to its entire satisfaction, of the tax in controversy, including interest and penalties.

The court *a quo*, therefore, lacked power to set aside the notice of deficiency, in the manner it did.[9]

The judgment appealed from will be affirmed insofar as it orders the Treasurer to permit the petitioner to establish the replacement fund and reversed as to the pronouncement setting aside the determination of deficiency.

---

Mr. Justice Negrón Fernández concurring, and dissenting in part.

I think the judgment appealed from should be affirmed as a whole. Once we reach the conclusion that the Treasurer was not justified in refusing to permit the establishment of the replacement fund, the basis on which said officer relied for determining that there had been a *gain* and, consequently, for levying the tax, by way of a deficiency, resulting from that gain, drops out of the case. In that situation, it is my opinion that the lower court, in disposing of the case, did not err in setting aside the Treasurer's determination of a deficiency.

Even though "the determination of a deficiency notified to the taxpayers is not litigated here", the latter, however,

---

[9] Even though we have decided that the notice of deficiency should remain intact in this case, we are aware of the fact that collection thereof would serve no useful purpose, since the taxpayers could, of course, immediately file a claim for refund based on the conclusion we reach here. However, we wish to make it clear that in an ordinary case, judicial review of an administrative decision issued prior to the notice of deficiency can not be utilized to prevent the Treasurer from going ahead with the notice of deficiency. A holding to the contrary would permit taxpayers in some cases to evade the guarantees for the collection of public revenues which, in connection with deficiencies, are found in the Income Tax Act.

claimed the right to the establishment of a replacement fund. Said right having been recognized, the pronouncement setting aside the determination of the deficiency which was the result of the Treasurer's own refusal to permit the establishment of said fund, is a necessary sequel of the final adjudication of the main issue, which is conclusive, is the law between the parties and cannot be relitigated. The peculiarity of this case consists in that the adjudication as to the existence of the taxpayers' right to the establishment of the replacement fund excludes the existence of the Treasurer's authority to levy the tax, inasmuch as the *gain* on which it could be levied, does not exist.

Wherefore I would affirm as a whole the judgment appealed from.